WELLS FARGO BANK, N.A.,

       Plaintiff,

   v.

WORLDWIDE SHRIMP COMPANY and
WILLIAM J. APPELBAUM,

       Defendants.

No. 17 CV 4723

Judge Manish S. Shah

## MEMORANDUM OPINION AND ORDER

Worldwide Shrimp Company and William L. Appelbaum opened a line of credit with Wells Fargo in 2014. Each signed loan documents that entitled Wells Fargo to certain self-help remedies in the event of a default. By early 2017, Wells Fargo was convinced that a default had occurred and began to institute those self-help remedies. When Worldwide and Appelbaum refused to cooperate, Wells Fargo sued for breach of contract, breach of guaranty, and accounting. Worldwide and Appelbaum counterclaimed, alleging that no default had occurred and that Wells Fargo breached the agreement by prematurely instituting the self-help remedies. Worldwide and Appelbaum brought other claims (many of which derive from, or relate to, the alleged default or lack thereof) and raised affirmative defenses. Wells Fargo moves to dismiss counterclaims and strike all affirmative defenses.

## I.	Legal Standards

A complaint must contain a short and plain statement of factual allegations that plausibly suggest a right to relief. *Ashcroft v. Iqbal*, 556 U.S. 662, 677–78 (2009); Fed. R. Civ. P. 8(a)(2). In ruling on a motion to dismiss, a court must accept all factual allegations as true and draw all reasonable inferences in the plaintiff's favor, but the court need not accept legal conclusions or conclusory allegations. *Id*. at 680–82. A complaint must "contain either direct or inferential allegations respecting all the material elements necessary to sustain recovery under some viable legal theory." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 562 (2007).

## II.	Facts

William L. Appelbaum is President of Worldwide Shrimp Company. [150] at 7, ¶ 22.[1] Worldwide imports frozen shrimp and distributes it to grocery stores and restaurant chains across the United States. [150-5] at 2. In September of 2014, Wells Fargo extended a line of credit to Worldwide and Appelbaum worth $15 million. [150] at 31, ¶ 7. The terms of that line of credit (and loans made pursuant to it) were documented in a "Credit Agreement" ([1-1] at 3–22), a "Revolving Line of Credit" note, ([1-1] at 23–29), a "Security Agreement" ([1-1], at 31–37), and a "Guaranty" ([1-1], at 41–46).

---

[1] Bracketed numbers refer to entries on the district court docket. Worldwide and Appelbaum's answer, [150], contains three sets of numbered paragraphs; one for Worldwide's and Appelbaum's responses to Wells Fargo's allegations, [150] at 1–27; one for Worldwide's and Appelbaum's affirmative defenses, [150] at 27–30; and one for Worldwide's and Appelbaum's counterclaims. [150] at 30–52. For that reason, citations to the answer include both page and paragraph numbers.

In exchange for the line of credit, Worldwide granted Wells Fargo various rights and privileges. Among other things, Worldwide promised to maintain, in accordance with "generally accepted accounting principles," (1) a "tangible net worth" of not less than $2.0 million, [1-1] at 9, § 4.9(a); [1-1] at 19, § 2; [1-1] at 22, § 4 (defining "tangible net worth" to mean, "the aggregate of total stockholders' equity plus subordinated debt less any intangible assets and less any loans or advances to, or investments in, any related entities or individuals"), (2) quarterly net income at or above $1, [1-1] at 9, § 4.9(b); [1-1] at 19, § 3, and (3) certain books and records. [1-1] at 9, § 4.2. Worldwide also agreed to provide Wells Fargo with certain financial information upon request, [1-1] at 9, § 4.3, and to permit Wells Fargo to audit the property Worldwide put forth as collateral for the loan. [1-1] at 11, § 4.11.

The Credit Agreement also contains an attorney's fee provision. That provision ([1-1] at 14, § 7.3) reads, in pertinent part,

> Section 7.3 COSTS, EXPENSES AND ATTORNEYS FEES. Borrower shall pay to Bank immediately upon demand the full amount of all payments, advances, charges, costs and expenses, including reasonable attorneys fees (to include outside counsel fees and all allocated costs of Bank's in-house counsel), expended or incurred by the Bank in connection with . . . (c) the prosecution or defense of any action in any way related to any of the Loan Documents . . . related to Borrower or any other person or entity.

Lastly, the Security Agreement contains provisions that control if Worldwide falls short of certain commitments. It lists eight "events of default," [1-1] at 12–13, § 6.1, including "(c) [a]ny default in the performance of or compliance with any

obligation, agreement or other provision contained herein or in any other Loan Document . . . ." *Id.* Upon the occurrence of an event of default, the Security Agreement grants to Wells Fargo the right to certain remedies, including the right to make "all indebtedness of Borrower . . . immediately due and payable," [1-1] at 9, § 6.2, the right to enforce "all rights, powers and remedies available under each of the Loan Documents," *id.,* and the right to opt out of "extend[ing] any further credit under any of the Loan Documents." *Id.*

The parties dispute whether an event of default ever occurred. They disagree about whether Worldwide and Appelbaum failed to make timely payments, [150] at 11, ¶ 35, whether Worldwide maintained the minimum allowable tangible net worth and net income, [150] at 12, ¶ 36, and whether Worldwide and Appelbaum sufficiently cooperated with efforts to obtain requested financial information. *See* [150] at 13–17, ¶¶ 39–56; at 18, ¶¶ 60–64.

The dispute about the timely payments is straightforward. Wells Fargo says Worldwide did not make all of its payments on time, [150] at 11, ¶ 35, and Worldwide says they did. *Id.*

The disagreement surrounding the "minimum tangible net worth" requires some background. When shrimp prices dropped in 2014, Keith Cable, a bank officer working at Wells Fargo, granted a formal written waiver (*see* [150-1]) temporarily releasing Worldwide from the covenant that required Worldwide to maintain certain quarterly profits. [150] at 32, ¶¶ 10–11; [1-1] at 10, § 4.9(b). In 2016, Appelbaum determined that shrimp prices were likely to drop again and made his

prediction known to Cable. [150] at 33, ¶¶ 15–16. Worldwide and Appelbaum allege that, after hearing about that prediction, Cable convinced them to pre-emptively recognize a decline in the value of Worldwide's inventory before the end of 2016. [150] at 33, ¶ 17. Doing so would cause Worldwide's tangible net worth to drop and so, on December 23, 2016, Appelbaum told Cable that, as part of efforts to make Worldwide "very healthy for the future," he would "probably break all my covenants." [150-2]. Worldwide and Appelbaum formally wrote-down the value of its inventory as of December 31, 2016. [150] at 34, ¶ 22.

Despite the preparations and pre-emptive write-down, the price of shrimp never dropped as far as predicted. According to Worldwide and Appelbaum, the true value of its collateral (in contrast to the value reflected in the write-down that was completed at the end of 2016) remained above the levels required by the Loan Documents at all times. [150] at 36, ¶¶ 29–30.

The parties also disagree about whether, as part of the negotiations around the anticipated drop in shrimp prices in 2016, Cable ever agreed to waive any of the covenants. Worldwide alleges that Cable "promised to waive any financial covenants impacted by premature recognition of the price decline" in 2016. [150] at 33, ¶¶ 18, 20. Both parties point to an email that Cable sent Appelbaum on February 17, 2017, [150-4], in which Cable says:

> Based on our last discussion and the net loss for FY16, I have attached a Reservation of Rights letter. Additionally, I am sending you a hard copy via mail.

> In the meantime, for corrective actions, we'll require an inventory appraisal[2] as well as a field exam to ensure that the loan is appropriately covered by collateral.
>
> Upon delivery of the inventory appraisal, we can move forward with waiving the covenant violations as we determine an appropriate Revolver commitment and accompanying covenants.

The reservation of rights letter that Cable attached concluded that an event of default had occurred because the write-down had rendered Worldwide in violation of the net-worth requirement, permitting Wells Fargo to exercise certain self-help remedies (like those described in § 6.2 of the Credit Agreement). [1-1] at 55. The letter indicated that Wells Fargo would "halt[] any further advances" on Worldwide's credit account. *Id.* And although Wells Fargo was "not electing to pursue any of its [other] rights and remedies," the letter said that Wells Fargo reserved the right to pursue those remedies in the future. *Id.*

Rather than calculate the actual value of Worldwide's tangible net worth, Wells Fargo took the position that Worldwide's write-down controlled and began to demand remedies it believed were provided for by the Loan Documents. *See* [150] at 36–37, ¶ 31; [1-1] at 13, § 6.2. For instance, Wells Fargo restricted Worldwide from drawing further principal on its line of credit, [150] at 37, ¶¶ 33, 46, began to impose "default interest," [150] at 37–38, ¶ 35; [1-1] at 26, § (d), and began to collect payment of attorneys' fees (and other professional fees). [150] at 38, ¶ 36; [1-1] at 14, § 7.3.

---

[2] Worldwide alleges that the inventory appraisal referenced in the email was completed the next day. [150] at 36, ¶ 27.

In April of 2017, Wells Fargo sought to have Worldwide and Appelbaum enter into a nonnegotiable forbearance agreement, the terms of which were (according to Worldwide and Appelbaum) so much more onerous than the terms of the Loan Documents that they "would have put [Worldwide] out of business." ¶ 34. Worldwide and Appelbaum say that Wells Fargo did so "intend[ing] to increase the stranglehold that [Wells Fargo] had upon [Worldwide] and its assets while further increasing the fees and penalties collected by [Wells Fargo] once the inevitable and unavoidable breach of the forbearance agreement would occur." [150] at 45, ¶ 72.

Worldwide also alleges that, from "May 2017 onward," Wells Fargo intentionally interfered with Worldwide's contracts by, among other things, unilaterally altering the terms of related purchase agreements and refusing to accept payments from Worldwide's customers. [150] at 49, ¶¶ 95–96. As a result, Worldwide was forced to breach certain contracts. [150] at 49, ¶ 96. For example, on November 16 and 17, 2017, Wells Fargo refused to process orders from Worldwide's customers because Worldwide "had minor balances owing to the purchasing parties" and, in so doing, cheated Worldwide out of an opportunity to reduce its loan balance by as much as $600,000. [150] at 39, ¶ 45.

The parties agree that, on May 16, 2017, Wells Fargo requested financial information that Worldwide and Appelbaum were required to provide pursuant to § 4.11 of the Credit Agreement. [150] at 18, ¶ 58. Worldwide and Appelbaum failed to provide that information. [150] at 18, ¶ 59. Worldwide and Appelbaum say that their failure was explained by severe injuries (two broken feet and a broken ankle)

that Appelbaum suffered when he fell off a ladder. [150] at 34, ¶ 23; at 18, ¶ 59. They also allege that, thereafter, Wells Fargo demanded meetings despite knowing that Appelbaum was injured and would have trouble complying. [150] ¶¶ 65–66.

## III.    Analysis

Worldwide and Appelbaum's joint amended answer, [150], brings counterclaims against Wells Fargo for breach of contract and the implied covenant of good faith and fair dealing, [150] at 38–40, promissory estoppel, [150] at 40–42, consumer fraud, [150] at 42–43, intentional infliction of emotional distress, [150] at 43–45, abuse of process, [150] at 45–49, tortious interference with contractual relations, [150] at 49–50, tortious interference with a business expectancy, [150] at 50–51, and declaratory relief. [150] at 51–52. Appelbaum is the only plaintiff for the claim for intentional infliction of emotional distress. [150] at 49–50. Each of the remaining counterclaims names both Appelbaum and Worldwide as plaintiffs.

Wells Fargo moves to dismiss the counterclaims and to strike the affirmative defenses. [157].

### A.    Motion to Dismiss

#### 1.    *Breach of Contract and the Implied Covenant of Good Faith and Fair Dealing*

Wells Fargo is suing Worldwide and Appelbaum for, among other things, breach of contract. [1-1] at 14–15. Wells Fargo's breach-of-contract argument depends in part on an assumption that an event of default occurred; if one did, Wells Fargo argues, it was authorized to make certain demands, *see* [1-1] at 13,

§ 6.2; [1] ¶¶ 50, 59, 65, and Worldwide and Appelbaum breached the loan documents by failing to comply with those demands. [1] at 14, ¶¶ 78, 79.

Worldwide and Appelbaum have counterclaimed and brought their own action for breach of contract. [150] at 38–40. They challenge Wells Fargo's assumption and come to a different conclusion; because there was no event of default, Wells Fargo's demands (and even their assertion that an event of default occurred at all) were themselves a breach of the loan documents. [150] at 38–40, ¶¶ 39–46; [161] at 1–2. Wells Fargo moves to dismiss Worldwide and Appelbaum's counterclaim for breach of contract. [157] at 8–10. To succeed, Wells Fargo must show that Worldwide and Appelbaum fail to sufficiently allege that no event of default ever occurred.[3]

Wells Fargo argues any breach of the loan documents was an "event of default," and that Worldwide and Appelbaum breached the loan documents in three ways: (1) by failing to make payments, (2) by allowing the tangible net worth of the company to drop below $2.0 million, and (3) by failing to provide certain financial information. [1] ¶ 77.

As for the first, Worldwide and Appelbaum have sufficiently alleged that they made all payments that were due absent an event of default. *See* [150] at 11, ¶ 35;

---

[3] In an earlier order, I observed that there was "no dispute (at this early stage) that Worldwide Shrimp and Appelbaum have defaulted on certain covenants in the loan agreements." [101] at 2. *See also* [136] at 2 ("[a]s I previously (and preliminarily) found, Worldwide Shrimp and Appelbaum defaulted on certain covenants in the loan agreements"). Worldwide and Appelbaum now dispute the determination that an event of default occurred. *See* [161] at 2. My earlier orders were preliminary and addressed the parties' prior contentions, and now I must address the parties' current contentions under the appropriate standards for a motion to dismiss.

[161] at 2, and that, even if an event of default did occur, any additional amounts due were paid on time. *See* [150] at 38, ¶ 40; [161] at 3, 5.

As for the second, Worldwide and Appelbaum have also sufficiently alleged that they never allowed the tangible net worth of the company to drop below $2.0 million. Worldwide and Appelbaum agreed that, at all times, the aggregate value of the total stockholders' equity (plus any subordinated debt, less intangible assets and loans or advances) would remain at or above $2.0 million. [1-1] at 22, § 4. They allege that it did. [150] at 36, ¶¶ 29–30.

Wells Fargo says it did not. As evidence, Wells Fargo cites the write-down Worldwide performed at the end of 2016. *See* [157] at 8–9. Documents evidencing the write-down (such as 2016 year-end financial reports, *see* [162] at 4, n.5) were not attached to the complaint, *see* [1-1], the answer, [150-1], or any of the briefs. *See* [157]; [161]; [162]. *See also* Fed. R. Civ. P. 10(c) (the "pleadings" include the complaint, the answer, and any documents attached as exhibits); *Geinosky v. City of Chicago*, 675 F.3d 743, 745 n.1 (7th Cir. 2012); (plaintiff may attach materials outside the pleadings to "illustrate the facts the [plaintiff] expects to be able to prove," so long as those "new elaborations" are consistent with the complaint); *Brownmark Films, LLC v. Comedy Partners*, 682 F.3d 687, 690 (7th Cir. 2012) (defendant may attach to their response documents that are "central" to the plaintiff's claims are referenced in the complaint).

Even if they had been, questions would have remained about what conclusion to draw from them. Neither party briefed the issue of whether "generally accepted

accounting principles" require recognizing the method of write-down that Worldwide employed (whatever method that might have been).[4] And even if Wells Fargo had shown that the right method was used, it is not clear that I could have found, as a matter of law and accepting Worldwide's allegations as true, that Worldwide's tangible net worth fell below the permissible amount. *See Dobson v. Comm'r of Internal Revenue,* 320 U.S. 489, 504 (1943) (determination of what was a "proper adjustment" under the Internal Revenue Code was an "accounting problem and therefore a question of fact"); *Thor Power Tool Co. v. Comm'r,* 563 F.2d 861, 866 (7th Cir. 1977), *aff'd,* 439 U.S. 522 (1979) (where two systems of accounting treat an inventory write-down differently, which system better reflects the asset's true value is a question of fact).

Instead, Wells Fargo relies on Worldwide's own characterizations of the write-down. But the admissions that Wells Fargo points to are not dispositive. Worldwide acknowledges that it "formally wrote down the value of its inventory," [150] at 34, ¶ 22, but not that the write-down caused Worldwide's tangible net worth to fall below $2 million according to generally accepted accounting principles.

Worldwide alleges that shrimp prices held steadier than anticipated in 2017 and left it with positive net margins sufficient to secure the credit lines. [150] at 36, ¶ 30. *See also* [150] at 36 ¶ 29 ("[Worldwide] has never been in material breach of any of the loan documents."). The allegations of the counterclaim are enough to

---

[4] Both parties instead assert that it was the other party's responsibility to determine whether Worldwide's tangible net worth fell below the contractually-obligated levels. [162] at 5; n. 7; [161] at 2–5.

plausibly state that the write-down did not actually reduce the net worth of Worldwide and was not an event of default.

Wells Fargo also points out that, in the immediately preceding paragraph of its answer, Worldwide acknowledges that, "prior to the write-down, . . . [Worldwide] was in full compliance." *Id.* ¶ 21. This is not an admission that Worldwide ever fell out of compliance. And even if Appelbaum anticipated that the write-down would "probably break all [his] covenants," [150-2], [161] at 4, n.1, what matters is whether that write-down actually did—according to generally accepted accounting principles and the formula outlined in the loan documents. [1-1] at 9, § 4.9(a); [1-1] at 19, § 2; [1-1] at 22, § 4. Appelbaum's email does not tell anyone whether that the covenants were actually broken.[5] Neither does anything else in the pleadings or the parties' briefing.

Despite failing on its first two arguments, Wells Fargo succeeds on its third; Worldwide and Appelbaum admit to failing to provide required information. On May 16, 2017, Wells Fargo requested information that was required pursuant to § 4.11 of the Credit Agreement, [150] at 18, ¶ 58; [1-1], and Worldwide and Appelbaum admit that they failed to provide that information. [150] at 18, ¶ 59.

---

[5] Nor can Wells Fargo rely on the May 17 Loan Report—which Wells Fargo drafted—as proof of default simply because Worldwide attached it to their answer. *N. Indiana Gun & Outdoor Shows, Inc. v. City of S. Bend*, 163 F.3d 449, 455 (7th Cir. 1998) ("Rule 10(c) does not require a plaintiff to adopt every word within the exhibits as true for purposes of pleading simply because the documents were attached to the complaint to support an alleged fact," especially not where the document was written by the opposition). Even if they could, Worldwide's adoption of the loan report at most amounts to an admission that Wells Fargo believed an event of default had occurred—not that one occurred in fact.

Their excuse is legally insufficient. Worldwide says that it was not able to provide the information because Appelbaum suffered two broken feet and a broken ankle when he fell off a ladder. [150] at 34, ¶ 23; at 18, ¶ 59. But physical injury is not a valid excuse to non-performance. "[W]hen a party contracts to do a thing without qualification, performance is not excused because by inevitable accident or other contingency not foreseen it becomes impossible for him to do that which he agreed to do." *Hemenover v. Buckles*, 225 Ill.App. 392, 394 (3rd Dist. 1922). *See also* 12A Ill. Law and Prac. Contracts § 250 ("[g]enerally, a failure to perform a contract according to its terms is not excused by mere unforeseen difficulty, or inconvenience, strikes, accident, or the breaking or disabling of machinery").

Even if the contracting party dies, the contract is still breached by non-performance of a term unless the contract is "personal" in nature. *Vogel v. Melish*, 31 Ill.2d 620, 626 (1964). "A contract is not 'personal in nature' if it can be performed by persons other than the deceased contracting party." *Mecartney v. Carbine's Estate*, 108 Ill.App. 282, 285 (1st Dist. 1903) (a contract is "personal in nature" if it "require[es] qualities peculiar to" the person who signed, such as one's "personal taste or skill").

Worldwide and Appelbaum have failed to allege that the provision of the requested financial information required a skill or ability "peculiar" to Appelbaum. It may have been difficult for Appelbaum to deliver the information; he was one of only a few employees (if not the only employee with access to the necessary information), and he was severely incapacitated. But that does not excuse

performance. He was required to find some other way to deliver the information, and he has admitted that he failed to do so. Even if determinations like this one are often factual, [161] at 6[6] (citing *Barrows v. Maco, Inc.,* 94 Ill.App.3d 959 (1st Dist. 1981); *Farwell Construction Co. v. Ticktin,* 84 Ill.App.3d 791 (1st Dist. 1980)), this one is not; Worldwide's and Appelbaum's admissions settle all material factual disagreements and permit a conclusion as a matter of law.

The admissions have consequences. The Credit Agreement made clear that "[a]*ny default* in the performance of or compliance with *any* obligation, agreement, or other provisions contained herein or in any other Loan Document" constituted an event of default. [1-1] § 6.1 (emphasis added). And an event of default in turn gave Wells Fargo the right to demand immediate and full repayment, [1-1] at 9, § 6.2, cease extending credit, *id.*, and exercise "all rights, powers, and remedies available" under the loan documents. *Id.*

These provisions cover each of the actions that form the basis of Worldwide and Appelbaum's breach of contract counterclaim. Worldwide and Appelbaum allege that Wells Fargo declined their requests to draw further principal on their line of credit. [150] at 37, ¶¶ 33, 46. But the Credit Agreement said that their obligation to extend credit would "cease and terminate" upon the occurrence of any event of default. [1-1] at 9, § 6.2. Worldwide and Appelbaum allege that Wells Fargo began

---

[6] Worldwide and Appelbaum also cite *Sahadi v. Cont'l Illinois Nat. Bank & Tr. Co. of Chicago*, arguing that whether the breach was "material" is a question of fact. 706 F.2d 193, 196 (7th Cir. 1983). But no one is arguing that the "event of default" was not a "material" breach; the event of default was not a "breach" at all—it was a condition that, once met, enabled Wells Fargo to pursue certain remedies. *See* [1-1] at § 6.2.

to impose "default interest." [150] at 37–38, ¶ 35. But the "Revolving Line of Credit Note" provides that, "during the continuance of an Event of Default," "default interest" will become "due and payable by acceleration or otherwise." [1-1] at 26, § d. Lastly, Worldwide and Appelbaum allege that Wells Fargo began to collect attorney's fees. [150] at 38, ¶ 36. But the Credit Agreement provides that Worldwide and Appelbaum must pay Wells Fargo "immediately upon demand the full amount of all payments . . . including attorneys fees" that are spent in "connection with" Wells Fargo's "continued administration" of the loan documents, the "enforcement of [Wells Fargo's] rights," and the "prosecution or defense of any action in any way related to any of the Loan Documents." [1-1] at 14, § 7.3. Worldwide and Appelbaum have failed to allege that they were charged fees going beyond those authorized by the loan documents. *See also* [157] at 10–11 (arguing that "[d]efendants have failed to point to any conduct not expressly permitted by the Loan Documents or applicable law").

For similar reasons, Worldwide's claims fail insofar as they allege that Wells Fargo breached the "covenant of good faith and fair dealing." [150] at 38. "Every contract implies good faith and fair dealing between the parties to it." *Martindell v. Lake Shore Nat. Bank*, 15 Ill.2d 272, 286 (1958). But "an implied covenant of good faith cannot overrule or modify the express terms of a contract." *N. Tr. Co. v. VIII S. Michigan Assocs.,* 276 Ill.App.3d 355, 367 (1st Dist. 1995). Wells Fargo's actions fell within the express terms of the loan documents; they are not breaches of the implied covenant of good faith and fair dealing. *Id.*

Moreover, "[t]he covenant exists to ensure that parties 'vested with contractual discretion exercise that discretion reasonably, not arbitrarily, capriciously, or in a manner inconsistent with the reasonable expectations of the parties.'" *Vara v. Polatsek*, 2012 IL App (1st) 112504-U, ¶ 64. When Wells Fargo concluded that an event of default occurred, it did not do so "arbitrarily, capriciously, or in a manner inconsistent with the reasonable expectations of the parties"; it did so accurately and in accordance with the reasonable expectations of the three business-savvy parties that signed the loan documents: Appelbaum, Worldwide and Wells Fargo. Even if Wells Fargo thought that the event of default was Worldwide's failure to maintain the minimum allowable net tangible worth (rather than Worldwide's admitted failure to provide necessary information), it would not have been "arbitrary" or "capricious" to rely on Worldwide's write-down as the basis for that conclusion (even if it might have been technically incorrect to do so).[7]

There is also the issue of waiver. Worldwide and Appelbaum's response acknowledges that the "primary basis" of their claims "do not lie with waiver or modification to the written Loan Documents." [161] at 2. But still: if Keith Cable

---

[7] Wells Fargo also argues that Worldwide and Appelbaum's breach of good faith and fair dealing claim is barred by the Illinois Credit Agreements Act, [157] at 10, implying that the claim derives from an alleged modification to the agreement and not from a breach of the loan documents themselves. *See* 815 Ill. Comp. Stat. Ann. 160/2. But their claim does not depend on the alleged modification (discussed more fully below); it is based on the loan documents themselves. [161] at 5 ("the ICAA cannot bar [Worldwide's] and [Appelbaum's] claims because they are predicated on breach of the written Loan Documents, not an oral modification of the Loan Documents").

waived the provision that resulted in the event of default, then Wells Fargo's self-help remedies would not have been properly enforced.

But Keith Cable did not waive any provisions of the loan agreements. First, Keith Cable's February 17, 2017 email is not sufficiently definite to constitute an enforceable promise. [150-4]. A contract remains unenforceable so long as "any mutual act between the parties remains to be done to give either a right to have it carried into effect." *Eckhart v. U.S. Fid. & Guar. Co.*, 280 Ill.App. 461, 470 (2nd Dist. 1935). Cable's offer to "waiv[e] the covenant violations" was conditioned on the "delivery of the inventory appraisal." [150-4]. Worldwide alleges that the inventory appraisal was completed the next day, [150] at 36, ¶ 27, but not that it was delivered.

Even if the condition had been met, Cable's email was at most an indication of a potential willingness to "move forward" with discussions about waiving the covenants. [150-4]. Those discussions were to involve many other considerations—including, explicitly, any "appropriate Revolver commitments" and "accompanying covenants." [150-4]. An offer is "the manifestation of willingness to enter into a bargain," but when "some further act of the purported offeror is necessary, the purported offeree has no power to create contractual relations, and there is as yet no operative offer." *Wigod v. Wells Fargo Bank, N.A.,* 673 F.3d 547, 561 (7th Cir. 2012). As a result, "a person can prevent his submission from being treated as an offer by [using] suitable language conditioning the formation of a contract on some further step, such as approval by corporate headquarters." *Id.* Cable's email was

nothing more than an indication of an intent to continue negotiating; it was not an operative offer, and it could not have been accepted by Worldwide or Appelbaum without some further indication of assent from Wells Fargo.

Lastly, the email is barred by the Illinois Credit Agreements Act. *See* 815 ILCS 160/1 *et seq.* (West 2012). Section two of that act requires that all credit agreements be in writing and be signed by both the creditor and the debtor. 815 Ill. Comp. Stat. Ann. 160/2. *See also* 815 Ill. Comp. Stat. Ann. 160/1 ("'Credit agreement' means an agreement or commitment by a creditor to lend money or extend credit . . . not primarily for personal, family or household purposes, and not in connection with the issuance of credit cards"); *Help At Home, Inc. v. Med. Capital, LLC*, 260 F.3d 748, 755 (7th Cir. 2001). Modifications to existing credit agreements must satisfy section two as well. *Area Wide 79th & W., LLC v. Sulaiman*, 2014 IL App (1st) 132324-U, ¶ 17; *Harris N.A. v. Hershey*, 711 F.3d 794 (7th Cir. 2013) (email barred because not signed by both parties). Even if Cable's email amounted to a modification of the loan documents, it had to be signed by both parties. It was not.[8] *See* [150-4].

Worldwide's breach of contract counterclaims depend on an assumption that no event of default occurred. Worldwide and Appelbaum admitted that an event of default took place and the provision that resulted in that event of default was never waived. The breach of contract counterclaim is dismissed.

---

[8] The waiver argument fails for yet another reason: amendments to the loan documents required the signature of both parties. [1-1] at 14 (Credit Agreement), § 7.5; [1-1] at 36 (Security Agreement), § 16.

2.   *Promissory Estoppel*

Worldwide and Appelbaum assert promissory estoppel as an independent cause of action. Their claim alleges that Worldwide and Appelbaum relied on Wells Fargo's promise to waive enforcement of certain financial covenants and that they suffered damages as a result. [150] at 41, ¶¶ 51, 55. Wells Fargo argues that promissory estoppel can, in some cases, be asserted as an affirmative cause of action, [157] at 11 (citing *Newton Tractor Sales, Inc. v. Kubota Tractor Corp.*, 233 Ill.2d 46, 59 (2009)), but not where a defendant is "trying to 'defensively prevent'" the plaintiff from enforcing a contact. *Id.* (citing *Hallmark Specialty Ins. Co. v. Roberg*, No. 14-CV-3657, 2015 WL 5163216, at *8 (N.D. Ill. Sept. 2, 2015)). Here, Worldwide and Appelbaum have asserted promissory estoppel as an affirmative cause of action seeking to address an alleged abandonment of an existing legal right. *See* [150] at 40–42. *Hallmark Specialty* is inapplicable.

In order to establish a claim of promissory estoppel, Appelbaum and Worldwide need to show that "(1) defendants made an unambiguous promise to plaintiffs, (2) plaintiffs relied upon that unambiguous promise, (3) plaintiffs' reliance was expected and foreseeable by defendants, and (4) plaintiffs relied on the promise to their detriment." *Ambulatory Surgical Care Facility, LLC v. Charter Oak Fire Ins. Co.*, 2016 IL App (1st) 141870-U, ¶ 38, *appeal denied,* 65 N.E.3d 839 (Ill. 2016).

Worldwide's promissory estoppel claim fails for many of the same reasons its waiver argument fails. First, the February 17, 2017 email is barred by the Illinois

Credit Agreements Act for purposes of their promissory estoppel claim, too. "A debtor may not maintain an action on or in any way related to a credit agreement unless the credit agreement is in writing . . . and is signed by the creditor and the debtor." 815 Ill. Comp. Stat. Ann. 160/2. The act applies in the context of promissory estoppel claims. *Whirlpool Fin. Corp. v. Sevaux*, 96 F.3d 216, 226 (7th Cir. 1996) ("the traditional exceptions to the Illinois Frauds Act—including part performance, estoppel and claims sounding in tort—may not be raised to counter an action that falls within the scope of the Credit Agreements Act"). As Worldwide and Appelbaum admit, their promissory estoppel claim "focuses on [Wells Fargo's] written promise to grant a waiver." [161] at 13.

Wells Fargo also argues that Worldwide and Appelbaum's reliance was neither expected nor foreseeable. *See* [162] at 10. First, Cable's email is from February 17, 2017, and Worldwide and Appelbaum had completed the write-down by the end of 2016. [150] at 34, ¶ 22. Wells Fargo could not have expected nor foreseen that Worldwide and Appelbaum would rely on an email that had not yet been sent. Even if the email had been written prior to the alleged reliance, it was not foreseeable that Worldwide and Appelbaum would interpret the phrase, "move forward with waiving the covenant violations as we determine an appropriate Revolver commitment and accompanying covenants" to mean that all covenants were waived, and then rely on that interpretation by writing down their inventory in a way that might have caused them to violate one of those covenants. *See Vincent DiVito, Inc. v. Vollmar Clay Prod. Co.*, 179 Ill.App.3d 325, 328 (1st Dist. 1989)

("[t]he promisee's reliance must be reasonable and justifiable"). Worldwide's counterclaim for promissory estoppel is dismissed.

### 3. *Illinois Consumer Fraud Act*

For a violation of the Illinois Consumer Fraud Act, Worldwide and Appelbaum must allege: "(1) a deceptive act or practice; (2) intent by the defendant that the plaintiff rely on the deception; (3) the deception occurred in the course of conduct involving trade or commerce; and (4) the plaintiff's injury was proximately caused by the fraud complained of." *Rockford Mem'l Hosp. v. Havrilesko*, 368 Ill.App.3d 115, 121 (2nd Dist. 2006).

Worldwide and Appelbaum allege that Wells Fargo's decision to enforce the self-help provisions of the loan documents was deceptive and unfair. [150] at 42–43, ¶¶ 57–61. Specifically, they cite Wells Fargo's declaration that a breach had occurred, its imposition of lending limitations, default interest, attorneys' fees and other expenses, interests, fees and costs. *Id.* at ¶ 61. But as discussed above and argued by Wells Fargo, *see* [157] at 13, each of these self-help remedies were explicitly authorized by the loan documents. Those actions were neither "deceptive" nor "unfair" because Worldwide and Appelbaum knew that those actions could be taken ahead of time and authorized Wells Fargo to take such actions in the event of a default. Worldwide and Appelbaum have admitted that an event of default took place, so the bank's actions were consistent with the bargain and not deceptive. *See also RBS Citizens, Nat. Ass'n v. RTG-Oak Lawn, LLC*, 407 Ill.App.3d 183, 192 (1st Dist. 2011) (counterclaim defendant "did nothing but abide by the terms of the Note,

which the record indicates was properly executed" and, therefore, no claim for fraud could lie under the Illinois Consumer Fraud act); *Reger Dev., LLC v. Nat'l City Bank*, 592 F.3d 759, 767 (7th Cir. 2010), *as amended* (Dec. 16, 2010) (a "party cannot close his eyes to the contents of a document and then claim that the other party committed fraud merely because it followed this contract").

Furthermore, to the extent Worldwide's and Appelbaum's fraud claims are premised on Wells Fargo's decision to avail itself of the self-help remedies provided for in the loan documents, those claims are duplicative of their breach of contract claims. *See* [162] at 11. They must be dismissed for that reason, too. *Greenberger v. GEICO Gen. Ins. Co.*, 631 F.3d 392, 399 (7th Cir. 2011) ("[w]hen allegations of consumer fraud arise in a contractual setting, the plaintiff must prove that the defendant engaged in deceptive acts or practices distinct from any underlying breach of contract").

In addition, Worldwide and Appelbaum allege that Wells Fargo engaged in a "litany of disruptive, invasive, and time consuming measures under the guise of curing WF's insecurity when WWS and WLA maintained valuable collateral well in excess of the outstanding loan balances." [150] at 61. It is not clear what these "measures" were, exactly. These allegations are threadbare and conclusory and fail to meet the requirements of *Ashcroft v. Iqbal*, 556 U.S. 662, 680–82 (2009). Appelbaum's and Worldwide's counterclaim for violation of the Illinois Consumer Fraud Act is dismissed.

### 4. *Intentional Infliction of Emotional Distress*

In order to state a claim for intentional infliction of emotional distress, Appelbaum must allege that "[1] the conduct involved [was] truly extreme and outrageous," "[2] the actor must either intend that his conduct inflict severe emotional distress, or know that there is at least a high probability that his conduct will cause severe emotional distress," and "[3], the conduct must in fact cause severe emotional distress." *Vance v. Chandler*, 231 Ill.App.3d 747, 751 (3rd Dist. 1992). Only conduct that is "so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency" qualifies as "truly extreme and outrageous." *Pub. Fin. Corp. v. Davis*, 66 Ill.2d 85, 90 (1976); *Rudis v. Nat'l Coll. of Educ.*, 191 Ill.App.3d 1009, 1013 (1st Dist. 1989) ("Illinois courts have essentially restricted the tort of intentional infliction of emotional distress to those cases in which the defendant's conduct is so abusive and atrocious that it would cause severe emotional distress to a person of ordinary sensibilities").

Appelbaum alleges that Wells Fargo intentionally inflicted emotional distress by unnecessarily requiring him to attend in-person meetings despite knowing that he was seriously injured. [150] at 43–44, ¶¶ 62–69. In particular, he alleges that Wells Fargo required the in-person meetings either with "the intention for its officers' conduct to inflict severe emotional distress, or knowing that there was a high probability that their conduct would cause severe emotional distress." [150] ¶ 67. Wells Fargo moves to dismiss Appelbaum's claims because (1) it claims it had the authority to demand "in face [sic] and on-site meetings," *see* [157] at 14; (2)

Worldwide had two other employees at the time and, therefore, Wells Fargo could not have known that Appelbaum would be the only one who could attend the meetings, [157] at 15; and (3) its conduct was not "beyond all bounds of decency." [157] at 15, n. 15. Appelbaum raises no arguments in response. *See* [161]. He has forfeited any arguments against dismissal of this claim. *Alioto v. Town of Lisbon*, 651 F.3d 715, 722 (7th Cir. 2011). A demand to meet in person, even if not expressly authorized by the contract, is not beyond the bounds of decency, and it is not reasonable to infer that Worldwide knew that only Appelbaum could conduct the meeting such that it called the meeting to torture him. The bank was tough and insensitive, but its conduct was not so outrageous to amount to a claim for the infliction of emotional distress.

5.  *Abuse of Process*

Worldwide and Appelbaum allege that Wells Fargo committed the tort of abuse of process. [150] at 45–49, ¶¶ 70–100. Worldwide and Appelbaum must allege, "(1) the existence of an ulterior purpose or motive and (2) some act in the use of process that is not proper in the regular course of proceedings." *Neurosurgery & Spine Surgery, S.C. v. Goldman*, 339 Ill.App.3d 177, 183 (2nd Dist. 2003).

Worldwide and Appelbaum allege that Wells Fargo took certain actions for improper purposes. For instance, they allege that Wells Fargo filed both the complaint ([1]) and the motion for receivership ([8]) in order to "coerce" Worldwide and Appelbaum into signing a forbearance agreement. [150] ¶¶ 72–77. They also allege that Wells Fargo intentionally selected an inexperienced individual to serve

as receiver to make the threat of receivership more powerful, [150] ¶¶ 79–81, and used mediation to further coerce Worldwide and Appelbaum into signing the forbearance agreement. [150] ¶ 86. This was all useful to Wells Fargo, they argue, because the forbearance agreement would have increased Wells Fargo's "stranglehold" on Worldwide and Appelbaum by making them subject to even more "draconian" terms than those that existed under the original loan documents. [150] ¶¶ 72–75. And, they point out that Wells Fargo withdrew the motion for receiver just after the deadline passed on their final settlement offer, *id.* ¶ 87, and attempted to dismiss this action in order to deprive Worldwide and Appelbaum of the opportunity to bring their counterclaim. [150] ¶ 89–90. *See also* [161] at 6–8.

When analyzing an abuse of process claim, Illinois courts analyze the facts of each case to "determine whether process has been used to accomplish some result beyond the purview of the process or to compel the party against whom it is used to do some collateral thing that he or she could not legally be compelled to do." *Kumar v. Bornstein*, 354 Ill.App.3d 159, 168 (2nd Dist. 2004).

Other Illinois cases are illustrative. In *Shatz v. Paul*, the court found that an abuse of process had occurred where the defendant used a legal process (*capias ad respondendum*) four times to force the plaintiff to borrow money to pay debts that the defendant knew the plaintiff could not pay and that had, in any event, already been discharged through accord and satisfaction. 7 Ill.App.2d 223 (1st Dist. 1955). In *Exec. Commercial Servs., Ltd. v. Daskalakis*, the court found an abuse of process where the defendant had used a different legal process (*ne exeat*) to have the

plaintiff arrested in order to extract money from other people the plaintiff knew. 74 Ill.App.3d 760 (2nd Dist. 1979) *abrogated on other grounds, Cult Awareness Network v. Church of Scientology Int'l,* 177 Ill.2d 267, 273 (1997).

In contrast, "the mere institution of proceedings, even with a malicious motive, does not in and of itself constitute abuse of process." *Kumar v. Bornstein*, 354 Ill.App.3d 159, 170 (2nd Dist. 2004). In *Erlich v. Lopin-Erlich*, the defendant sought and obtained a temporary restraining order to prevent her husband, the plaintiff, from withdrawing assets that were subject to their marriage dissolution proceedings. 195 Ill.App.3d 537, 539 (1st Dist. 1990). The plaintiff alleged that the defendant had lied to the court in order to obtain the temporary restraining order and was only using the order to "wreak[] havoc with the plaintiff's ordinary business affairs." *Id.* at 539. But the court found there had been no abuse of process because the act of obtaining the temporary restraining order was not itself extraneous to the purpose of the marriage dissolution proceedings. *Id.*

Wells Fargo argues that Worldwide's and Appelbaum's claims fail because Wells Fargo's conduct was "proper in the regular course of proceedings"; each action that Wells Fargo allegedly took was authorized by contracts that Worldwide and Appelbaum signed and/or was lawfully undertaken in furtherance of the present lawsuit. But Worldwide and Appelbaum do not allege that Wells Fargo's actions were themselves improper, they allege that Wells Fargo had "an ulterior purpose or motive" and then "improperly us[ed] the legal process to obtain collateral advantage." [161] at 8. The "improper purpose usually takes the form of coercion to

obtain a collateral advantage, not properly involved in the proceeding itself, such as the surrender of property or the payment of money, by the use of the process as a threat or a club." *Barrett v. Baylor*, 457 F.2d 119, 122 (7th Cir. 1972); *Dixon v. Smith-Wallace Shoe Co.*, 283 Ill. 234, 241–42 (1918) ("an abuse of process exists where a party employs it for some unlawful object or purpose which it was not intended by the law to effect"). Wells Fargo's argument misses that distinction.

Wells Fargo also argues that no claim for abuse of process can lie because Wells Fargo was not under any obligation to offer the forbearance agreement. [157] at 16–17 (citing *MDFC Loan Corp. v. First Shopping Ctr. Partn.*, 1996 WL 99909 (N.D. Ill. Mar. 1, 1996); *Kham & Nate's Shoes No. 2, Inc. v. First Bank of Whiting*, 908 F.2d 1351, 1357 (7th Cir. 1990)). The argument is neither here nor there: Wells Fargo still could have committed the tort of abuse of process if it had used this lawsuit as a pretext for pressuring Worldwide and Appelbaum into additional concessions and had aimed to obtain those additional concessions through the forbearance agreement—even if it was not required to offer the forbearance agreement.

Wells Fargo's last argument, however, succeeds. As Wells Fargo points out, Worldwide and Appelbaum "have not alleged any special harm outside of the 'fees, costs, and inconvenience' that Defendants' already owed as a result of defaulting under the Loan Documents." [162] at 13–14. They are required to. *Barrett v. Baylor*, 457 F.2d 119, 123 (7th Cir. 1972) ("[t]he complaint merely recites the facts surrounding the filing of the three state causes of action and adds conclusionary

[sic] allegations that this litigation has caused and will cause harm to the plaintiff, but does not allege any special harm other than that which normally flows from any litigation"). Worldwide and Appelbaum never signed the forbearance agreement. They never became subject to the "stranglehold" and additional "draconian terms" of which they complain. Each of the harms they mention in their counterclaim (inconvenience, loss of time and energy, attorneys' fees and related expenses) amount to nothing more than that which "normally flows from any litigation." *Id.* Worldwide and Appelbaum's abuse of process claim is dismissed.

### 6. *Tortious Interference with Contractual Relations*

Worldwide and Appelbaum allege that Wells Fargo tortiously interfered with their contractual relations. [150] at 49, ¶¶ 93–100. To survive a motion to dismiss, Worldwide and Appelbaum must allege "(1) the existence of a valid and enforceable contract between plaintiff and a third person; (2) defendant's knowledge of the existing contract; (3) defendant's intentional and malicious inducement of the breach; (4) a subsequent breach by a third person; and (5) damage to the plaintiff." *Kraft Chem. Co. v. Illinois Bell Tel. Co.*, 240 Ill.App.3d 192, 198 (1st Dist. 1992).

The claim is based on the allegation that Wells Fargo prevented third parties from completing transactions with Worldwide and Appelbaum. The factual allegations in support are difficult to piece together, *see* [150] at 39, ¶ 44–45; at 49, ¶ 95; [161] at 9, but they can be summarized as follows: Wells Fargo interfered with Worldwide's and Appelbaum's contractual relations by (1) refusing to accept payments from third parties (either directly or through an agent) and/or refusing to "process orders" made by third parties, which caused Worldwide and Appelbaum to

breach their agreements with third parties,[9] and (2) "unilaterally altering the terms of [] purchase contracts" in ways that prevented "[Worldwide] from consummating the purchase contracts." *See id.* Worldwide and Appelbaum allege that Wells Fargo justified the former set of actions by citing small debts that Worldwide and Appelbaum owed to the purchasing parties. *Id.*

Wells Fargo's first argument is that the Illinois Credit Agreement Act bars Worldwide's and Appelbaum's tortious interference claims. [157] at 17–18. In *Gen. Elec. Capital Corp. v. Donogh Homes, Inc.*, the "entire premise" of the alleged "interference" was that the party accused of interference had "reneged on its promise to modify and extend" various loans. No. 93 C 5614, 1993 WL 524814, at *4 (N.D. Ill. Dec. 15, 1993). But Worldwide's and Appelbaum's tortious interference claims are not "entirely premised" on Cable's February 17, 2017 email (consideration of which is, admittedly, barred by the Illinois Credit Agreement Act, 815 Ill. Comp. Stat. Ann. 160/2); they are also premised in part on the argument that an event of default never occurred in the first place*, see* [161] at 9, and the

---

[9] In Worldwide and Appelbaum's response to the motion to dismiss, Worldwide and Appelbaum incorrectly characterize the counterclaims as asserting that it was the customers, and not Worldwide and Appelbaum, that breached the purchase contracts. *See* [161] at 9 ("customer's breach"). Clarifications can be considered, but only to the extent that they are "consistent with" the complaint. *Wafra Leasing Corp. 1999-A-1 v. Prime Capital Corp.*, 247 F.Supp.2d 987, 1000 (N.D. Ill. 2002) ("[w]e will consider additional information in a responsive brief to a motion to dismiss to the extent that it is supplemental and consistent with the complaint and clarifies the information in the complaint"). *See also Hrubec v. Nat'l R.R. Passenger Corp.*, 981 F.2d 962, 963–64 (7th Cir. 1992) ("[a] plaintiff need not put all of the essential facts in the complaint" and "may add them by affidavit or brief—even a brief on appeal"). Rather than a "clarification," Worldwide and Appelbaum's (apparently mistaken) assertion—which is unsupported by any of the facts alleged in their counterclaims—only makes their argument less clear. I disregard it for purposes of this analysis.

argument that, if one did, Wells Fargo still committed tortious interference by taking actions that went beyond those authorized by the loan documents in the event of a breach. *See id.* The Illinois Credit Agreement Act alone cannot decide their claim.

Wells Fargo's second argument is that its actions were privileged. *See* [157] at 18–19. In certain situations, a privilege protects defendants where the defendant is a creditor that has conflicting rights with a third party. *See Langer v. Becker,* 176 Ill.App.3d 745, 750 (1st Dist. 1988). This privilege applies "where the defendant was acting to protect an interest which the law deems to be of equal or greater value than the plaintiff's contractual rights." *HPI Health Care Servs., Inc. v. Mt. Vernon Hosp., Inc.*, 131 Ill.2d 145, 157 (1989). "In most cases, conflicting contractual rights stand on an equal plane." *Connaughton v. Gertz*, 94 Ill.App.3d 265, 270 (1st Dist. 1981). As a result, "when A has a valid contract with C, and C enters into a contract with B, and the enforcement of A's contract depends on the non-enforcement of B's contract, A is privileged to use any reasonable means to bring about a breach of B's contract with C to protect his own interest." *Id.*

In determining whether the privilege applies, Illinois courts look to the factors outlined in the Second Restatement of Torts. *See Miller v. Lockport Realty Grp., Inc.*, 377 Ill.App.3d 369, 376 (1st Dist. 2007); Restatement (Second) of Torts § 767 (1979). A defendant who is protected by the privilege "is not justified in engaging in conduct which is totally unrelated or even antagonistic to the interest

which gave rise to defendant's privilege." *HPI Health Care Servs., Inc. v. Mt. Vernon Hosp., Inc.*, 131 Ill.2d 145, 158 (1989).

When the privilege "is apparent on the face of a claim . . . , it is the plaintiff's burden to plead and prove that the defendant's conduct was unjustified or malicious." *Miller v. Lockport Realty Grp., Inc.*, 377 Ill.App.3d 369, 375 (1st Dist. 2007); *HPI Health Care Servs., Inc. v. Mt. Vernon Hosp., Inc.,* 131 Ill.2d 145, 156 (1989). But here, the privilege is not apparent on the face of the counterclaim. At least according to the allegations, Wells Fargo's actions (i.e., failing to process orders and accept payments, and/or unilaterally changing contract terms in ways that caused Worldwide and Appelbaum to breach their agreements with third parties) were not authorized by the loan documents, not in furtherance of its own interests or the interests of the third parties, and not socially desirable.[10]

---

[10] A full application of the factors from the Restatement demonstrates why. First, Wells Fargo's conduct went beyond the authority it was granted by the loan documents: accepting payments from third parties does not normally require the extension of credit, and neither party has argued there was some other provision in the loan documents that gave Wells Fargo the right to do so. Nor has either party advanced any arguments that otherwise explain a motive for Wells Fargo's actions, or any explanation of how they were in furtherance of Wells Fargo's interests. True, Wells Fargo's interests are not limited to the express terms of the agreement—any "interest which the law deems to be of equal or greater value than the plaintiff's contractual rights" will suffice. *HPI Health Care Servs., Inc. v. Mt. Vernon Hosp., Inc.*, 131 Ill.2d 145, 157 (1989). But even if Wells Fargo had some interest beyond the agreement—say, in deterring Worldwide and Appelbaum (and others) from breaching credit agreements in the future—the law would not necessarily deem that interest to be "of equal or greater value," especially where Wells Fargo's methods went beyond the purview of any existing agreement and were (allegedly) antagonistic to its interest in reducing Worldwide's and Appelbaum's debts. The third parties' interests in engaging in a lawful business deal with Worldwide and Appelbaum were legitimate and productive. "Social interests," too, counsel in favor of discouraging creditors from unnecessarily restricting the flow of income to their debtors. Finally, Wells Fargo was positioned relatively closely to the interference; Wells Fargo either directly instructed an agent to refuse to process orders and/or accept the payments or did so themselves. *See* [150] at 39. The last factor (the relations between the parties) neither weighs for nor against a

Accordingly, Worldwide and Appelbaum need not allege that Wells Fargo's conduct was unjustified or malicious—even though they do. [150] at 49, ¶ 98, ("interference with [Worldwide's] purchase contracts was not justified or privileged"). *See also Neutral Tandem, Inc. v. Peerless Network, LLC*, No. 08 C 3402, 2008 WL 11406149, at *6 (N.D. Ill. Dec. 4, 2008).

Instead, the burden to explain why the privilege applies falls to Wells Fargo. Wells Fargo points out that it had a "security interest" in Worldwide and Appelbaum's inventory and accounts receivable, and suggests that its actions were necessary to protect Wells Fargo's rights as "senior creditor." [157] at 19. The problem is that Wells Fargo has failed to explain how the transactions at issue (as characterized by Worldwide and Appelbaum) were in furtherance of Wells Fargo's interests. If Worldwide and Appelbaum had been attempting to pay a third party, Wells Fargo might have had an interest in preventing the flow of money away from its debtor to a third party. The same might be said if processing the orders had itself required the extension of further credit to Worldwide and Appelbaum. But according to the allegations, neither of these things was happening: Worldwide's and Appelbaum's customers were attempting to pay Worldwide and Appelbaum via Wells Fargo, and Wells Fargo was "failing to accept payments" and "unilaterally altering the terms of purchase agreements" for no apparent reason. [150] at 49, ¶ 95. And even if Wells Fargo had a "security interest" in Worldwide and Appelbaum's inventory, it is not clear that this security interest allowed (or made it

finding on the issue of privilege. On balance, the privilege is not apparent on the face of the claim.

desirable for) Wells Fargo to prevent Worldwide and Appelbaum from offloading some of that inventory in return for payment. *See* [1-1] at 5, § 1.3.

Wells Fargo's third argument—that Worldwide and Appelbaum's claim for intentional interference with contractual relations fails because Well Fargo did not induce a third party to commit the breach—succeeds. [157] at 18 (citing *Cohen v. Am. Sec. Ins. Co.*, 735 F. 3d 601, 613 (7th Cir. 2013) ("[a] claim for intentional interference with contract requires that the defendant intentionally and unjustly induced another to breach a contract with the plaintiff")). *See also Douglas Theater Corp. v. Chicago Title & Tr. Co.*, 288 Ill.App.3d 880, 887–88 (1st Dist. 1997) ("defendant's interference must be directed toward a third party"); *Webb v. Frawley*, 906 F.3d 569, 577 (7th Cir. 2018) ("[u]nder Illinois law, liability for tortious interference may only be premised on acts immediately directed at a third party which cause that party to breach its contract with the plaintiff"). Worldwide and Appelbaum consistently allege that Wells Fargo caused them to breach their agreements with third-parties—not that Wells Fargo caused their third-party customers to breach the agreements. [150] at 39, ¶ 45; at 49, ¶ 96; [162] at 12. Even though Wells Fargo's actions directly impacted a third party, they did not cause that third party to breach an agreement—they caused Worldwide and Appelbaum to breach their agreement. Worldwide and Appelbaum's claim for tortious interference with contractual relations is dismissed.

### 7.    *Tortious Interference with a Business Expectancy*

Worldwide and Appelbaum also allege that Wells Fargo tortiously interfered with their business expectancy. [150] at 50, ¶¶ 101–108. Worldwide and Appelbaum

must allege, "(1) a reasonable expectancy of entering into a valid business relationship; (2) the defendant's knowledge of the expectancy; (3) the defendant's intentional and unjustified interference that prevents the realization of the business expectancy; and (4) damages resulting from the interference." *Chicago's Pizza, Inc. v. Chicago's Pizza Franchise Ltd. USA*, 384 Ill.App.3d 849, 862 (1st Dist. 2008).

The factual allegations supporting the claim for tortious interference with a business expectancy are similar to the contractual relations claim. In addition to re-alleging an earlier paragraph that explains how Wells Fargo's agent ("ARG Recovery"), at Wells Fargo's direction, "refused to process [Worldwide] orders . . . merely because [Worldwide] had minor balances owing to the purchasing parties," Worldwide and Appelbaum also allege that Wells Fargo has "caused [Worldwide] to be unable to provide products to WWS customers and/or to provide products on the usual and customary terms, such that WWS products are unwelcome." [150] at ¶ 104.

Wells Fargo advances the same arguments against the claim for tortious interference with a business expectancy that it advances against the claim for tortious interference with contractual relations. *See* [157] at 17–20. Its arguments about the Illinois Credit Agreement Act fail for the same reason they failed with the tortious interference with contractual relations claim: Worldwide's and Appelbaum's claims do not depend on Cable's February 17, 2017 email.

The same privilege that protects defendants in contractual relations claims protects defendants in business expectancy claims. *See Mannion v. Stallings & Co.*,

204 Ill.App.3d 179, 189 (1st Dist.1990). And the same pleading requirement that applies in contractual relations claims applies in business expectancy claims, too. *Id.* (when the privilege is "is apparent on the face of a claim . . . ., it is the plaintiff's burden to plead and prove that the defendant's conduct was unjustified or malicious"). As with the earlier claim, Wells Fargo's privilege is not apparent on the face of the counterclaim, even more so here because Worldwide and Appelbaum have added the allegation that Wells Fargo acted "despite its knowledge that [Wells Fargo's] actions would likely cause [Worldwide] to take substantially longer to pay the loan and that [Wells Fargo] would financially benefit to a greater extent . . . than it would have if [Wells Fargo] had not implemented its various and unnecessary self-help remedies." [150] ¶ 106.

But again, Wells Fargo's third argument succeeds, albeit for a slightly different reason: plaintiffs asserting claims for tortious interference with a business expectancy must allege "a business expectancy with a specific third party as well as action by the defendant directed towards that third party." *Associated Underwriters of Am. Agency, Inc. v. McCarthy*, 356 Ill.App.3d 1010, 1020 (1st Dist. 2005). Worldwide and Appelbaum have not identified any specific third parties; to the degree they identify them at all, they refer to them exclusively as "customers." *See* [150] at 50, ¶ 102. Worldwide and Appelbaum's claim for tortious interference with a business expectancy is dismissed.

8. *Declaratory Relief*

Lastly, Worldwide and Appelbaum bring a claim for declaratory relief. [150] at 51, ¶¶ 109–112. The Federal Declaratory Judgment Act provides that, "upon the filing of an appropriate pleading," any court of the United States "may declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought." 28 U.S.C. § 2201. "[D]istrict courts possess discretion in determining whether and when to entertain an action" under the act. *Wilton v. Seven Falls Co.,* 515 U.S. 277, 282 (1995).

The "American rule" with regard to attorneys' fees holds that "[e]ach litigant pays his own attorney's fees, win or lose, unless a statute or contract provides otherwise." *Baker Botts L.L.P. v. ASARCO LLC*, 135 S. Ct. 2158, 2164 (2015). Section 7.3 of the Credit Agreement states that Worldwide and Appelbaum shall pay to Wells Fargo "immediately upon demand" all payments, costs and expenses, "including attorneys fees (to include outside counsel fees and all allocated costs of Bank's in-house counsel)" that are "incurred . . . in connection with . . . (c) the prosecution or defense of any action in any way related to any of the Loan Documents." [1-1] at 14, § 7.3. The Credit Agreement requires that Worldwide and Appelbaum pay those attorneys' fees incurred by Wells Fargo in connection with this action. *Id.* There is no provision in the contract that would allow for the delay of such payments until a determination that Wells Fargo had prevailed. *See id.* Worldwide and Appelbaum have not pointed to any fees or payments that go beyond what is authorized by the Credit Agreement. Worldwide and Appelbaum must make

these payments "immediately upon demand." *Id.* The claim is dismissed because it seeks a declaration that is contrary to the parties' agreement.

### B.    Motion to Strike

Wells Fargo moves to strike Worldwide's and Appelbaum's affirmative defenses under Federal Rule of Civil Procedure 12(f), [157] at 2, which states that "[t]he court may strike from a pleading an insufficient defense or any redundant, immaterial, impertinent, or scandalous matter." Fed. R. Civ. P. 12(f). Motions to strike are disfavored, and affirmative defenses will only be struck where they are "insufficient on the face of the pleadings." *Heller Fin., Inc. v. Midwhey Powder Co.*, 883 F.2d 1286, 1294 (7th Cir. 1989) ("[o]rdinarily, defenses will not be struck if they are sufficient as a matter of law or if they present questions of law or fact").

Worldwide and Appelbaum assert as affirmative defenses a breach of the duty of good faith and fair dealing, [150] at 27–28, release and satisfaction, [150] at 28, equitable estoppel, *id.*, laches, *id.* at 29, material breach, *id.*, failure to mitigate, *id.* at 30, and duress. *Id.*

Wells Fargo argues that Worldwide and Appelbaum are precluded from asserting an affirmative defense based on a breach of the duty of good faith and fair dealing because such a claim is not independently cognizable under Illinois law. [157] n.9. While it is true that the two cases Wells Fargo cites in support confirm that the duty of good faith and fair dealing does not impose on the parties a set of obligations independent from those imposed by the contract itself, *Beraha v. Baxter Health Care Corp.*, 956 F.2d 1436, 1443 (7th Cir. 1992); *N. Tr. Co. v. VIII S.*

*Michigan Assocs.*, 276 Ill.App.3d 355, 367 (1st Dist. 1995), neither case says that a breach of the duty can never form the basis of an affirmative defense. In fact, the sentence immediately after the one quoted by Wells Fargo in *N. Tr. Co. v. VIII S. Michigan Assocs.*, acknowledges that, when asserted along with allegations containing sufficient factual support, a breach of that duty can form the basis of an affirmative defense. 276 Ill.App.3d at 367.

Nonetheless, as discussed above, Worldwide and Appelbaum are unable to state a claim for breach of the duty of good faith and fair dealing. Their affirmative defense is premised on the same theory as their counterclaim; that "no breach or violation of the loan agreements has transpired" and that, as a result, the loan documents should not be "interpreted or enforced" as Wells Fargo has interpreted and enforced them. [150] at 27–28, ¶ 1; at 38–40, ¶¶ 38–48. Their affirmative defense is dismissed for the same reason that their counterclaim is dismissed; the pleadings establish that Wells Fargo did nothing other than that which was authorized under the loan documents. *N. Tr. Co. v. VIII S. Michigan Assocs.*, 276 Ill.App.3d 355, 367 (1st Dist. 1995).

Similarly, Wells Fargo argues that Worldwide and Appelbaum's affirmative defense of laches should be struck because is based on communications "like the 2/16/17 Reservation of Rights Letter," and that the defense should be stricken "based on Wells Fargo's continuous statements of non-waiver." [157] at 5, n.4. But Worldwide and Appelbaum allege that their laches argument is based on "multiple communications, both via telephone and in writing," [150] at 29, ¶ 4, and those

allegations must be taken as true. *Ashcroft v. Iqbal*, 556 U.S. 662, 680–82 (2009). The laches defense requires further factual development and is not insufficient on the face of the pleadings. *Heller Fin., Inc.*, 883 F.2d at 1294.

Lastly, Wells Fargo challenges Worldwide and Appelbaum's affirmative defense of duress. Worldwide and Appelbaum assert this defense in response to Wells Fargo's claims for breach of contract, breach of guaranty, and accounting. [150] at 30, ¶ 7. In support, they cite Wells Fargo's attempts to coerce Worldwide and Appelbaum into signing the forbearance agreements. *Id.* Wells Fargo argues that the duress defense should be stricken because negotiations around the forbearance agreement did not begin until long after Worldwide and Appelbaum had signed the loan documents, and could not possibly be the source of a duress defense to their claims. [157] at 16, n.16. If Worldwide and Appelbaum had signed the forbearance agreement, they might have been able to show that they did so under duress. But they cannot use the forbearance agreement negotiations to support a claim that they were under duress when they signed the loan documents. As it is, their affirmative defense of duress is insufficient on the face of the pleading. It is stricken.

I decline to strike the rest of the affirmative defenses because they are not insufficient on their face; each presents an argument that, if properly supported by facts, could serve to advance Worldwide's and Appelbaum's interests. In addition, Wells Fargo has not demonstrated that it is prejudiced by the presence of the affirmative defenses in the pleadings—they may be without merit in the end, but

the scope of discovery is not changed by their presence and striking them would not expedite resolution of the case. The motion to strike is denied except as to the affirmative defenses of duress and the duty of good faith and fair dealing. Both are stricken.

## IV. Conclusion

For the foregoing reasons, Wells Fargo's motion to dismiss Worldwide's and Appelbaum's counterclaims, [157], is granted in part, denied in part. Worldwide and Appelbaum's affirmative defenses of duress and breach of the duty of good faith and fair dealing are stricken. Worldwide and Appelbaum's other affirmative defenses are not stricken. The counterclaims are dismissed.[11]

ENTER:

Manish S. Shah
United States District Judge

Date: December 20, 2018

---

[11] The dismissals are without prejudice. *Runnion ex rel. Runnion v. Girl Scouts of Greater Chicago & Nw. Indiana*, 786 F.3d 510, 519 (7th Cir. 2015) ("[o]rdinarily, however, a plaintiff whose original complaint has been dismissed under Rule 12(b)(6) should be given at least one opportunity to try to amend her complaint before the entire action is dismissed").